May it please the Court, I'm John Willing, I'm representing the Plaintiff and Appellant, Jennifer Yessian. At the outset, I want to note that I'd asked for five minutes of rebuttal time, so I'll try to adhere to that going forward. However, we're here today simply because the District Court wrongly granted summary judgment against Mrs. Yessian on her claims for employment discrimination. The Court did so based upon mistakes in law, mistakes in fact, misapplication of the law to the evidence, and so the trial court's decision should be reversed. At the outset, I think one of the things that's most striking about the District Court's opinion is the extent to which the Court was reluctant to even acknowledge the appropriate standard for decision. The case law is clear, federal and California law, that the plaintiff's burden of proof in contesting a motion for summary judgment in connection with claims for employment discrimination is a minimal one, and in fact, the plaintiff need only produce very little evidence to support its claims and avoid a grant of summary judgment. Even so, here, the trial court hardly acknowledged that standard of decision, stating in its opinion only that plaintiff's client argued for it. The court itself never expressly admitted that standard controlled, and I think as we look at the decision rendered by the District Court, it's clear that it didn't truly, its findings did not truly adhere to that standard. Well, what, just to start working through these claims, as to that prima facie showing, what evidence did Ms. Yasan bring forward that the employer knew about her disability? And in fact, that's certainly where I was headed, so thank you for the question. Leaving aside for now the question of imputation of knowledge, I'll turn to that in a second. We have pointed out to the evidence in the testimony of Novartis's chief investigator, a woman by the name of Susan Pierre, who undertook all nine investigations of Ms. Yasan in this matter, who testified that, well, her regular custom and practice was to review any prior investigation reports that would have involved the subject, Ms. Yasan. So we know that that's what should have happened here, and that's what would have ordinarily happened here. We also know that the investigation reports to which you referred, the earlier investigations conducted with respect to a former supervisor, Joanne Moore, expressly referenced Ms. Yasan's suffering from lupus. And so that evidence alone creates an inference that Ms. Pierre, in fact, would have and should have reviewed those reports and would have seen it during the course of those investigations and therefore had knowledge of the lupus. Right, but in your deposition of Ms. Pierre, it says, well, that's the usual course, that didn't happen here, and she didn't have any knowledge. She did deny it. I think that's actually your strongest evidence that could come closest to the statement, because doesn't that create an inference that is a genuine dispute of material fact, because that she's created, that Ms. Pierre's created, because on the one hand, her testimony is that it was her practice to look at this, and so that would have been, when was the first investigation? That was 2020, Your Honor. Okay, so in 2020, in her first investigation, it was her general practice to review all prior reports, and there's this 2019 report that indicates that your client has lupus, right? Indeed, that is our argument, Your Honor. Okay, but then she comes back and later sort of recants that, saying, well, I had no knowledge. Well, what she precisely said was that she didn't recall reviewing the reports, and then later she says, oh, I didn't have knowledge of the lupus at all. Right, and so I think that's what is your strongest argument, that Pierre, who conducted these investigations, knew of the lupus. So what else is there in the record that shows that she, in her investigations, acted with discriminatory intent toward your client? I think we've gone to some length to try to detail the disparate treatment that Mrs. Gessine received in the course of these investigations, how she was only investigated, or she was repeatedly investigated in connection with matters where other employees, other Novartis employees engaged in similar misconduct, but were not subjected to investigation at all. I mean, one, the most blatant example may be the travel and expense reports where there were 10 different employees identified in an audit as having committed infractions, but of all of them, Mrs. Gessine, the lupus sufferer, was the only one who was made the subject of Ms. Pierre's investigation. Mr. Mourning, when we think about the similar, are we looking at just instance by instance, or for a comparable, aren't we supposed to look at everyone who are similarly situated in Mrs. Gessine, which is someone who had a longer history of compliance violations? Are we allowed to identify comparators just with respect to a single instance? Because none of the other comparators, as far as at least your review of the record shows, had these other compliance issues. I would argue that that's a question of fact for a jury to decide, with the similarity and the... Well, what fact do you... So what's the question of fact? Because is there evidence in the record to create a genuine issue? If the state of comparators is material, where is the evidence in the record to create a genuine issue as to other compliance violations by these folks who are also caught up in the travel issue? I would certainly have to concede, Your Honor, that, for example, the other employees identified in the travel expense report review do not have a similar kind of compliance history. I would, however, say that I believe there is question of fact to the extent that there were employees who were implicated in multiple of these investigations. For example, Mrs. Usain's supervisor, Mr. Blumrich, who was not similarly investigated. And in that case, that... And this is going back to the very first investigation. Mr. Blumrich was left, right, resigned before termination. So the claim here of disability discrimination is about the termination, not the investigation. I think our position, Your Honor, is that it's all part and parcel of the adverse employment actions taken against Mrs. Usain. And we cite a case law to that effect, that you have to look at the totality of the circumstances and that the accident investigation can be considered themselves as part of the adverse consequences or the adverse actions taken against her. And going back to this kind of comparator question, I would point out that with respect to Mr. Blumrich, you know, from the very first investigation, he wasn't included with respect to the virtual Congress. Even though he was, one, Mrs. Usain's supervisor, and two, he himself acknowledged a misunderstanding of kind of the propriety of the actions that Mrs. Usain had undertaken. However, later on, when Mrs. Usain was acting in a supervisory role, she was of course implicated in the investigation and reprimanded and then ultimately terminated. So, you know- What was the timeline of those two for us to try to understand? So remind me, so Mr. Blumrich, not investigated, resigns. Where was the investigation as to the comparator acts between Mr. Blumrich and Mrs. Usain relative to Mr. Blumrich's resignation? So the initial investigation was undertaken in 2020. That's one where Mr. Blumrich is not included, but Mrs. Usain is. In 2021, there is a second round of investigations where Mrs. Usain is investigated. In that instance, Mr. Blumrich was folded in with a portion of the claims. And then my understanding is it was in early 2022 that Mr. Blumrich resigned from the company prior to the termination of Mrs. Usain and the Internal Review Committee. And he was disciplined too? I think there was, in connection with the reports, by the time the IRC, the Internal Review Committee met, he was already gone from the company. So he really did not suffer any kind of substantial consequence other than there may have been some coaching that was done in connection with the second round of investigations. So who instigates these investigations? I understand Susan Pierre performed all the investigations, but who would instigate them, start the investigation? Ostensibly, it was this compliance department. There's a regulatory compliance department within Nopartis. There was a gentleman, Daniel Bonilla, who was, I think, responsible for the overwhelming majority of the initial reports. And so that's essentially where they stem from. But again, to the extent that Mrs. Pierre was involved in these investigations, she had the opportunity and the ability, as she did in other cases, to expand the scope of the investigation to include others and did not. We believe that's an indication of disparate impact, disparate treatment, and discriminatory intent and motive. And all this goes back to this issue of the appropriate standard, the minimum burden, and the reasons why the courts have adopted that standard. We think that's clear. All right. So I know you want to save five minutes, but let's assume that the district court erred in finding there was no prima facie case. Let's assume there's a prima facie case. Haven't the defendants come up with legitimate, non-discriminatory reasons sufficient to defeat the prima facie case? They have articulated a reason for a non-discriminatory reason for Mrs. Usain's determination. True. And you would argue that's pretext.  And there's sample evidence of pretext. And I'm sorry, I apologize. I don't mean to speak over you. That's my question. Let's leap to pretext. Okay. So here again, we believe the district court was off base in its analysis. We think the district court took a very myopic view of the evidence and really just honed in the series of investigative reports that were prepared, I think, mostly by Mr. Bonilla, but that concerned each of the assigned investigations. And 201, those investigation reports said, well, these aren't significant matters. In many of the cases, they said there's not even a need for an investigation at all. But that wasn't the last word on those investigations. Well, that depends on how you look at it, because those investigative reports were modified even after the peer report was submitted. And that's the evidence that we've provided in our report. But when they said they're not significant, I'm also looking for some context here in terms of the process. When they said they were not significant, that was before they'd done any investigation. That was just the initiating process. But can an employer not, after actually having done the investigation, which I would hope is generally a good practice, change its determination? Well, it could. And it did. And it did change the reports after the investigation. And even in changing the reports, it still said that the matters weren't significant. And the other point I'd raise here, even beyond the reports themselves, which weren't simply intake forms, there was other evidence of discrepancies between Novartis' assertion that Mississippi signed exposed the company to significant and unnecessary risk and the facts of the investigations themselves. But what are we supposed to do with the collective judgment that they make, right? So any individual one, maybe the conclusion is not significant. But if there's a pattern, and we've talked a little bit about comparators, what's the pretext in that pattern, given the number of investigations that are issued? It shows that Mississippi signed was repeatedly targeted for matters that, by its own admission, Novartis deemed to be not significant, deemed to be technical in nature, deemed to not expose the company to any significant risk. And so that speaks to pretext, notwithstanding all the other kind of factors, the temporal proximity, the disparate treatment. And so that's really where we believe the pretext argument holds up. And in fact, again, under the standard of minimal burden, which also applies to the pretext argument, and very little evidence, we believe that that burden has absolutely been satisfied. All right. Thank you, Counselor. You've got some time left. May it please the Court, Your Honors. Scott McIntyre, on behalf of the affilees. Judge Kenley Tia Cato properly granted summary judgment in this straightforward employment discrimination case where my clients first coached the plaintiff and only terminated her after, as Judge Johnstone had indicated, after repeated violations over a two-year period. She was first counseled. She acknowledged, Your Honors, that she was an employee at will who could be terminated for merely not performing up to expectations. That's ER 1435. She certainly did not perform up to expectations. And she acknowledged, Your Honor, at her deposition that not even she believed that there was discriminatory animus here based on the protected statuses at issue, disability, sex, age. She acknowledged that at her deposition at 1437. But she's asking this Court to empanel a jury to speculate, to say, well, because I mentioned lupus once, it must have been because of that. Well, on that, picking up on Judge Wardlaw's line of questioning to your friend, why hasn't Ms. Pierre essentially created a genuine issue of material fact with this question of her knowledge as to the prima facie case? Yes, Your Honor. Thank you for that question. She has not created a genuine issue of material fact because she specifically requested that investigation file, which lupus evidently was just mentioned in passing. She did not receive it. She swore under oath she did not receive it. That she swore that she didn't recall receiving it. She did. Well, she submitted a declaration and testified at her deposition saying she did not have any knowledge of it. She didn't say she, for a fact, did not receive it. Well, she didn't look at it if she received it, Your Honor. Let's be clear on what she actually said. Yes, she had zero knowledge of lupus. And I believe there was testimony at the deposition that she had requested it. She did not look at it. More to the point, here's what plaintiff said. This is concern to Ms. Moore, who was a previous supervisor. At 1447 of her deposition, ER 1447, the plaintiff admitted Ms. Moore has nothing to do with this case. So let's take a step back on this knowledge element and think about what this case isn't. This is not a case where the plaintiff has alleged, I was requesting time off from lupus. I need an accommodation. The plaintiff specifically testified under oath. That's not this case, Your Honor. Well, so what I understand with Ms. Moore, Ms. Moore was her supervisor and was concerned that she was upgrading her flights. And Ms. Yessians told her that she had lupus, and that's why she needed to have flights over five hours, a higher, you know, better seating so that she could stretch out. Ms. Pierre knew nothing of that, Your Honor. And the question that came up about who initiated these, Mr. Bonilla, anyone can initiate a  the person who raised these multiple complaints, seven different allegations over a two-year period, didn't know anything about this. Okay, so who was that person? Well, it's various people. There's all sorts of different individuals. Mr. Bonilla was the first one, and there were numerous different individuals. Mr. Cinco, I believe, raised issues. Anyone under policy was obligated to raise compliance issues when they noticed that someone had committed compliance violations. So certainly Mr. Bonilla, Jason Merzla, head of compliance, reported the T&E. That's one example. The forms were submitted to Your Honor's question. It's merely at the initial outset when a complaint is made. Those people who submitted the forms were not involved in the investigation, and that's intentional. Ms. Pierre is an investigator. She did the investigation, and Ms. Pierre was not involved in the decision. There was an internal review committee initiated, which an HR representative, Stephen Grauburger, who submitted the declaration in the record. Mr. Theodore Sheridan submitted a declaration in the record. They looked at Ms. Pierre's report, so it was even further insulated from the person who complained. So there's a complaint, then there's an investigation by professional investigators like Ms. Pierre. Then there's an internal review committee that considers it. If I may, Judge, I'd like to go to her deposition when I ask her about who she mentioned this lupus to. And so Ms. Moore didn't come up at her deposition. So this is ER 1445. Well, let me explain this. So I ask her, you don't have any facts indicating that you were substantially limited in your ability to work during the time you worked at defendants, correct? Correct. That's 1445. So this is unlike the Alejandro case in the brief that my friend relies on, where someone requests an accommodation and argues that I requested time off or I requested not working at night, something to that effect, because of a disability. At best, there's simply a reference to lupus. Think about it in the world of work. How many times a day does an employee mention a medical condition? Knowledge alone isn't enough. If that were the case, we would have a jury trial every time an employee says, I was hurt at work. Right, but, you know, I've seen a lot of these cases. And usually there's not summary judgment granted that says there's no prima facie case. Usually we're, there's, you know, this is atypical in that sense, which is why I'm trying to understand the legitimate non-discriminatory reasons. And I would, one thing I would like to understand is how significant are these, to the company, are these compliance violations? Because from a lay, you know, lay person not understanding your company, the company, your client, how, how significant are these, these kinds of things to your company? What's in the record about that? Yes, Your Honor. What's in the record? Very good. I appreciate the question. She was informed at her termination by Mr. Graalberger, who was on the committee, the IRC, who actually, who did, made the decision. He met with her and said, this is serious. I don't want to misquote the exact language, but he said this was substantially serious. And she had talked about a consent decree. These are the kind of compliance issues that a highly regulated company, pharmaceutical company involving FDA regulations, she was counseled on that from the beginning by Ms. Pierre. Slow down. Take your time. We take compliance seriously. And to Judge Johnstone's point, you can't look at each one of these in isolation. Because a company like Novartis or any employer, especially a highly regulated employer dealing with FDA regulations, has the right to avoid an external issue. The whole goal of compliance is to avoid, number one, to make sure patients are not injured, but number two, to also avoid a federal investigation. But if these various compliance issues, all of them kind of independently, were so significant, why does that lend more power to the lack of comparators or the comparators who weren't investigated? Well, collectively, Your Honor, keep in mind that the first two compliance issues, she was coached. Slow down. She was not terminated until the five later after being coached, after being counseled to take compliance more seriously, take a conservative approach to compliance. Then she literally backdated contracts. They became more serious. So let's think about what she actually did. She was responsible for going out and getting positions as consultants. And these positions literally did work before the contract was in place. That was a major compliance violation. And what's more, she backdated the contract. She acknowledged this to Ms. Pierre and at her deposition. This is not something that's minor. This is something that's frankly dishonest. And she also committed an ethics violation during Ms. Pierre's investigation. Ms. Pierre, she had a duty to disclose emails with the physician in question. She did not disclose an email showing that she actually had personal contact with the  She was trying to blame Ms. Lennis, her subordinate. Black letter case law says that subordinates and supervisors are not similarly situated. That being said, she was previously counseled. You can't, you need to take accountability. This was the director of marketing. This was not a lower level employee. This was a high level manager who worked as a pharmaceutical rep for many, many years, did not have issues. But then she moved into the marketing role, judges, in 2020. That's when she started having the issues. And she was counseled to take it slow, take a conservative approach. And she didn't do it. And she had the ethics violation, which makes her different than anybody else. What was the, I'm trying to square up the various intake forms with that. But were these later violations begun as significant, were they said? Yes, Your Honor. The timeline was these later violations occurred. This was over a two year period, Your Honor. And these later violations occurred in 2021 and were investigated. So where's the intake form that says at the outset that this is a big deal, that this is significant? Well, remember, Your Honor, the people who complain, any employee at the company can submit an intake form. So the intake form is merely talking about an opinion of someone in terms of external patient health. Immediate patient health would be sort of the number one issue, something involving that. So the intake forms, just like anything else, a form, even if there is an inconsistency, which we're not saying there is, that goes to the body of case law saying even a decision that's unwise, the business judgment rule saying making a mistake. But the opinion of someone who initiates the investigation into an issue cannot control before the investigation starts and before the decision makers make the decision. And I will come back to say that it's a collective taking into account the history of compliance violations over the seven year period. And there's nothing in the record saying, one, if something happened only one time, that would result in termination. That's not what we're arguing here. It's the collective over a two year period. And this is not someone who the company was eager to terminate. You know, they coached over the two year period. So it was interesting. She worked there for 20 years. Yes, Your Honor. And there were no problems until 2020 when she was moved into marketing. And then the problem seemed to suddenly appear in the marketing. Now, when she was in sales for 20 years, there was nothing. There's nothing worth citing. In fact, she had a lot of awards and recognition, right? That's correct, Your Honor. The history of her in previous jobs is frankly irrelevant to the case. So it's in marketing that she was, and it also coincided with COVID. Is there any evidence in the record that her lupus was the reason that she wasn't as attentive to detail or complying fully with some of these compliance requirements? No, Your Honor. There is zero evidence of that. And in fact, I asked her that question whether she believed that anyone had taken action based on any sort of condition. The answer was no to that. And that applies to age, sex. If you look at the complaint, she makes broad allegations that frankly just weren't backed up by the deposition. And Judge Kenley Cato granted the motion to dismiss based on, in part, the reason that she simply said she didn't believe anybody had any animus here. She didn't view herself as disabled, as needing an accommodation. I literally asked her if she was substantially limited in working. No. The answer is straightforward, no. And she found employment after this termination, hadn't requested an accommodation in the new job. So that's why I say, unlike Alejandro and Gemini and Avila that were cited, there was zero evidence of the employee saying, look, I can't do this marketing job. I need some assistance. Or I need X or Y. That's not this case. There are many of those cases. I defend those. Those are difficult cases. This is not that difficult case where you have an employee saying, well, my lupus is preventing me from doing this. It's not the case. And Avila involves somebody mentioning an actual qualifying disability. And I will point out that Avila makes the point that mentioning lupus alone or any other disability is not enough in the alleged disability. There has to be something communicated that reflects that the only reasonable interpretation is they're requesting that they're suffering from a disability. Something that affects major life activities. Mentioning lupus alone is not enough. And I come back to the fact somebody mentions, I have a health condition. I have anything else that could account for a disability. As your honors know, after the Americans with Disabilities Amendments Act, the law has been changed a bit. But it's still very easy to qualify as a disability, as having a disability. So it's not mentioning the condition alone. There has to be some effect. And she never requested time off. She never requested anything. And so all this talk about Miss Pierre, if this were a different case, why didn't she mention to Miss Pierre, I think this is because of my disability. I think Mr. Bonilla or someone is holding my disability against me. They didn't know. And they didn't know because she never made it relevant. When I ask her that. Counsel, just to make sure I understand. So even if Miss Pierre had some knowledge of it, you're saying that really wouldn't make any difference because just mentioning that you have lupus, if that's what was mentioned in the report, is insufficient. That's right. Because there has to be some causation. There has to be some discriminatory animus. The disability has to substantially cause the adverse action. And she admitted her deposition. She doesn't believe that was the reason. And it wasn't the reason. And I asked her what was discussed. I revealed that I had lupus. This is the only thing that came up when I asked her this, Your Honor's question. I wanted to get to the bottom of this. She mentioned an unnamed male HR representative in 2020. That's the only reference to lupus she made. And she said, here's a quote from her. This is ER 1438. This was all because the president had mentioned this drug that could, during COVID. She said it was right during COVID that this particular drug could maybe help COVID patients. She heard the president mentioning that, President Trump. And she said, well, maybe Novartis has some supplies of this drug that they have saved for employees. That's why she mentioned it. I revealed, here's her answer. I revealed that I had lupus and that Novartis at the time had, were supplying generic lupus to large institutions, I believe. It was believed at the time that Plaquenil helped with COVID. The president at the time told people on media that Plaquenil helped patients with COVID. Because of that, people would go and get prescriptions of Plaquenil filled, even though they did not have lupus, which made it impossible to actually get your prescription of Plaquenil. So because of that, I asked if Novartis had, since they provided so many large quantities of Plaquenil to the community or to hospitals, that they reserved any for employees. And if they did, can employees have access to the medication? And then on line nine at ER 1439, I follow up and say, that's your complete answer. Yes, that is the whole sum and substance of lupus. That's her deposition. This is not a case saying, I have to work night. Your Honor had a case involving somebody who had lupus who was disabled, who couldn't work at night, the Kinley case. That's not this case, Your Honor. It's just not. This would have been a completely different case. We would have approached it a different way. The summary judgment would have been different. It's not a failure to accommodate case. It's just not. It looks like my time's up. If there's any other questions. Thank you. If I may, just briefly, I'd point out that in the original motion for summary judgment, the defendants didn't contest that Ms. Usine suffered from a physical disability. That wasn't the issue. And so the question here isn't whether or not her life activities back in 2020 or 21 were actually limited by her medical condition. In fact, under FEHA, the Fair Employment and Housing Act in California, the definition of a physical disability encompasses conditions that are likely to lead to limitation of major activities, major life activities in the future. Well, do you agree with the case law that your friend mentioned about just mentioning lupus alone is not sufficient, or do you disagree with that case law? On principle, no. I think there has to be other evidence. You can't just simply say we told there's the evidence of discriminatory conduct, disparate treatment, the direct knowledge of her, I'm sorry, Ms. Pierre's direct knowledge of her condition. But essentially, it's really just Ms. Usine having been singled out and targeted repeatedly within months of her having disclosed this medical condition. And because it was a physical disability per statute and per FEHA, this whole argument about whether or not she was being affected at the time is really just a red herring. Mr. Mori, I want to ask you a question arising from one of your last lines in your opening. It said that the kind of the minimal standard of proof that applies at the prima facie stage also applies at the pretext stage. How do we square that with the cases that require a plaintiff to come forward with specific and substantial evidence of pretext? Am I missing something on what the governing standard is there? We have cited, I'm sorry, in our brief case law, which shows, I apologize. I'm looking at Bradley, for example. And so, for example, I'm sorry, we had cited in our opening brief to the Morgan decision at 88 Calat 4th, page 69, where the court said expressly that the plaintiff is required to produce very little direct evidence of the employer's discriminatory attempt to move past summary judgment. Here, we believe we've done that given that we've shown direct contradictions by the employer between its various internal reports and its stated grounds for determination. There are direct contradictions between the testimony of witnesses in these investigations who repeatedly found that the alleged violations were nuanced or technical or not egregious. We believe that that alone meets this standard of very little evidence to overcome a motion for summary judgment. Okay, thank you very much, counsel. Yes, in versus Novartis Pharmaceuticals will be submitted. And this session of the court is adjourned for today. Thank you very much, counsel. All rise. This court for this session stands adjourned. Thank you.
judges: WARDLAW, JOHNSTONE, UNKNOWN